## Contract of Sale

### Between

### LIBERTY TOWERS REALTY I LLC

### LIBERTY TOWERS REALTY LLC ("Seller")

### and

### Delshah Ventures LLC (or its assignee )( "Purchaser")

### Dated: May 12, 2015

### Premises:

Street Address:

The entire land at 180 Richmond Terrace, Staten Island, New York 10301, 184 Richmond Terrace, Staten Island, New York 10301, 186 Richmond Terrace, Staten Island, New York 10301, 188 Richmond Terrace, Staten Island, New York 10301, 190 Richmond Terrace, Staten Island, New York 10301, 192 Richmond Terrace, Staten Island, New York 10301, 194 Richmond Terrace, Staten Island, New York 10301(Blocks 13, Lots 75, 78, 79, 80, and 81) and

170 Richmond Terrace, Staten Island, New York 10301, 178 Richmond Terrace, Staten Island, New York 10301, 20-24 Stuyvesant Place (a/k/a 27-33 Hamilton Avenue), Staten Island, New York 10301, 18 Stuyvesant Place, Staten Island, New York 10301, 8 Stuyvesant Place, Staten Island, New York 10301 (Blocks 13, Lots 100, 103, 104, 82, and 92).

City or Town: Staten Island
State: New York.

# Table of Contents

Section 1.    Sale of Premises and Acceptable Title……………….……..1

Section 2.    Purchase Price, Acceptable Funds, Existing Mortgages, Purchase Money Mortgage, Escrow of Downpayment and Foreign Persons………………………………………..……2

Section 3.    The Closing……………………………………...…..2

Section 4.    Representations and Warranties of Seller………………..…2

Section 5.    "As Is" Condition, No Representations Not Expressly Set Out in Contract, Representations and Warranties of Purchaser……………………………………………..….4

Section 6.    Covenants of Seller…………………………………...…5

Section 7.    Seller's Closing Obligations………………………………6

Section 8.    Purchaser's Closing Obligations……………………………7

Section 9.    Apportionments…………………………………….…... 8

Section 10.    Objections to Title, Failure of Seller or Purchaser to Perform and Vendee's Lien………… ………………………..…..8

Section 11.    Notices………………………………………….......10

Section 12.    Limitations on Survival of Representations, Warranties, Covenants and other Obligations……..………………...…10

Section 13.    Miscellaneous Provisions……… …..……….…..…………10

## SCHEDULES

Schedule A.    DESCRIPTION OF PREMISES

Schedule B.    PERMITTED EXCEPTIONS

Schedule C.    PURCHASE PRICE

Schedule D.    MISCELLANEOUS

Schedule E.    RENT SCHEDULE

Schedule F.    FORM OF ESTOPPEL LETTER

Schedule G.    INSURANCE POLICIES

Schedule H.    EMPLOYEES

Schedule I.    SERVICE CONTRACTS

Schedule J.    CERTIFICATE OF OCCUPANCY

Schedule K.    FORMS OF PURCHASE MONEY NOTE AND MORTGAGE

**Contract of Sale -- Office, Commercial and Multi-Family Residential Premises**

CONTRACT OF SALE ("Contract") dated May 8, 2015 between Liberty Towers Realty I LLC and Liberty Towers Realty LLC ("Seller") and  Delshah Ventures LLC (or its assignee )("Purchaser").

Seller and Purchaser hereby covenant and agree as follows:

**Section 1.**          Sale of Premises and Acceptable Title

Section 1.1. Seller shall sell to Purchaser, and Purchaser shall purchase from Seller, at the price and upon the terms and conditions set forth in this contract: (a) the parcel of land more particularly described in Schedule A attached hereto ("Land"); (b) all buildings and improvements situated on the Land (collectively, "Building"); (c) all right, title and interest of Seller, if any, in and to the land lying in the bed of any street or highway in front of or adjoining the Land to the center line thereof and to any unpaid award for any taking by condemnation or any damage to the Land by reason of a change of grade of any street or highway; and (d) the appurtenances and all the estate and rights of Seller in and to the Land and Building (collectively, the "Premises").  For purposes of this contract, "appurtenances" shall include all right, title and interest of Seller, if any, in and to (i) streets, easements, rights-of-way and vehicle parking rights used in connection with the Premises; (ii) any strips or gores of land between the Land and abutting or adjacent properties; and all guarantees thereof, as shown on Schedule E attached hereto and any leases entered into by Seller between the date of this contract and the Closing (as hereinafter defined); (iv) the Service Contracts (as hereinafter defined); (v) plans, specifications, architectural and engineering drawings, prints, surveys, soil and substrata studies relating to the Premises in Seller's possession, whether or not stored, managed or contained on computer software or hardware; (vii) all licenses, permits, certificates of occupancy and other approvals issued by any state, federal or local authority relating to the use, maintenance or operation of the Premises or the fixtures, machinery or equipment included in this sale to the extent that they may be transferred or assigned; (x) air rights and development rights; and Phase 1 and all other environmental reports.  This sale also includes all trade fixtures and all equipment, machinery, materials, supplies and other personal property attached or appurtenant to the Building or located at and used in the operation or maintenance of the Land or Building to the extent same are owned by Seller or any affiliate of Seller (the "Personal Property").   The street address of the Premises is set forth on Schedule D attached hereto.

Section 1.2. Seller shall convey and Purchaser shall accept fee simple title to the Premises in accordance with the terms of this contract, subject only to: (a) the matters set forth in Schedule B attached hereto (collectively, "Permitted Exceptions"); and (b) such other matters as the title insurer specified in Schedule D attached hereto (or if none is so specified, then any title insurer licensed to do business by the State of New York) shall be willing to omit as exceptions to coverage or to except with insurance against collection out of or enforcement against the Premises.

--

**Section 2.        Purchase Price, Acceptable Funds, Existing Mortgages, Purchase Money Mortgage, Escrow of Downpayment and Foreign Persons**

**Section 2.1.** Purchaser shall pay to the Seller the purchase price ("Purchase Price") set forth in Schedule C attached hereto.  Subject to the terms and conditions of this contract.

Section 2.2. Except for the Downpayment (hereinafter defined), all monies payable under this contract, unless otherwise specified in this contract, shall be paid by (a) certified checks of Purchaser or wire transfer or any person making a loan to Purchaser drawn on any bank or trust company having a banking office in the City of New York and which is a member of the New York Clearing House Association or (b) official bank checks drawn by any such banking institution, except that uncertified checks of Purchaser payable to the order of Seller up to the amount of $2,500 shall be acceptable for sums payable to Seller at the Closing, or (c) with respect to the portion of the Purchase Price payable at the Closing, at Seller's election, by wire transfer of immediately available federal funds to an account designated by Seller not less than three business days prior to the Closing.

(a)  All sums paid on account of the Purchase Price prior to the Closing (collectively, "Downpayment") shall be paid by good check or checks drawn to the order of and delivered to the Law Offices of David Carlebach, Esq. ("Escrowee").  The Escrowee shall hold the proceeds thereof in escrow in a attorney trust account at Citibank until such time as the deposit is disbursed at closing or otherwise pursuant to this Contract.

**Section 2.        The Closing**

Except as otherwise provided in this contract, the closing of title pursuant to this contract ("Closing") shall take place on the scheduled date and at the time of closing specified in Schedule D (the actual date of the Closing being herein referred to as "Closing Date") at the place specified in Schedule D. Anything to the contrary notwithstanding, the closing is dependent upon a bankruptcy court order approving a plan of reorganization approving the terms of and conditions of this contract selling the Premises free and clear of all liens encumbrances and claims to Purchaser. An amended plan and disclosure statement will be filed no later than May 19, 2015, and will be subject to review and approval by Purchaser and/or its counsel.  Said bankruptcy court order shall be obtained no later than one hundred and twenty (120) days after the date of the within Contract of Sale.  If a bankruptcy court order approving the Sale is not obtained within one hundred and twenty (120) days thereof, Purchaser may cancel the Contract and request the return of the Downpayment without penalty.

**Section 3.        Representations and Warranties of Seller**

Seller represents and warrants to Purchaser as follow:

--

Section 3.1. Seller is the sole owner of the Premises and has not granted any option to purchase the Premises or any right of first refusal or right of first offer to purchase the Premises.

Section 3.2.    Seller is not a "foreign person" as defined in the Code Withholding Section and will provide FIRPTA Certification at Closing.

Section 3.3.    Seller is a New York Corporation that has been duly organized and is in good standing under the laws of the state of its formation.

Section 3.4.    Seller has taken all necessary action to authorize the execution, delivery and performance of this contract and has the power and authority to execute, deliver and perform this contract and consummate the transaction contemplated hereby. The person signing this contract on behalf of Seller is authorized to do so. This contract is subject to the approval of the United States Bankruptcy Court of the Eastern District of New York under an approved plan of reorganization transferring title to the Purchaser free and clear of all liens, encumbrances and claims.

Section 3.5.    The execution and delivery of this contract and the performance of its obligations hereunder by Seller will not conflict with any provision of any law or regulation to which Seller is subject or any agreement or instrument to which Seller is a party or by which it is bound or any order or decree applicable to Seller or result in the creation or imposition of any lien on any of Seller's assets or property which would materially and adversely affect the ability of Seller to carry out the terms of this contract.

Section 3.6.    Seller is not a, and is not acting directly or indirectly for or on behalf of any, person, group, entity or nation named by any Executive Order of the United States Treasury Department as a terrorist, "Specifically Designated National and Blocked Persons," or other banned or blocked person, entity, nation or transaction pursuant to any law, order, rule or regulation that is enforced or administered by the Office of Foreign Assets Control and Seller is not engaged in this transaction, directly or indirectly on behalf of, or instigating or facilitating this transaction, directly or indirectly, on behalf of any such person, group, entity, or nation.

Section 3.7.        Seller has received no notice of and has no knowledge of any actual or proposed taking in condemnation of all or any part of the Premises.

For purposes of this Section, the phrase "to Seller's knowledge" shall mean the actual knowledge of Liberty Towers Realty I LLC and Liberty Towers Realty LLC and/or its principal, Toby Luria, without any special investigation.

Except where limited specifically to the date of this contract or other date, the representations and warranties made by Seller in this contract are made as of the date of execution and delivery of this contract, and except as otherwise set forth in §6.5, shall be deemed restated and shall be true and accurate on the Closing Date.

**Section 4. "As Is" Condition, No Representations Not Expressly Set Out in Contract, Representations and Warranties of Purchaser**

**Section 4.1.** Purchaser acknowledges that:

(a)  Anything to the contrary, notwithstanding, Purchaser has inspected or has had an opportunity to inspect the Premises, is fully familiar with the physical condition and state of repair thereof, shall accept the Premises "as is" and in their present condition, subject to reasonable use, wear, tear and natural deterioration between now and the Closing Date, without any reduction in the Purchase Price for any such change in condition.  Seller shall not be liable for any latent or patent defects in the Premises. Anything to the contrary notwithstanding, this contract is not subject to any due diligence on the part of the Purchaser.

(b)  Before entering into this contract, Purchaser has made such examination of the Premises, the operation, income and expenses thereof and all other matters affecting or relating to this transaction as Purchaser deemed necessary.  In entering into this contract, Purchaser has not been induced by and has not relied upon any representations, warranties or statements, whether express or implied, made by Seller or any agent, employee or other representative of Seller or by any broker or any other person representing or purporting to represent Seller, which are not expressly set forth in this contract, whether or not any such representations, warranties or statements were made in writing or verbally.

Section 4.2.  Purchaser represents and warrants to Seller that:

(a)  The funds comprising the Purchase Price to be delivered to Seller in accordance with this contract are not derived from any illegal activity.

(b)  Purchaser has taken all necessary action to authorize the execution, delivery and performance of this contract and has the power and authority to execute, deliver and perform this contract and the transaction contemplated hereby.  The person signing this contract on behalf of Purchaser is authorized to do so.  Assuming this contract has been duly authorized, executed and delivered by each of the other party(ies) to this contract, this contract and all obligations of Purchaser hereunder are the legal, valid and binding obligations of Purchaser, enforceable in accordance with the terms of this contract, except as such enforcement may be limited by bankruptcy, insolvency, reorganization or other similar laws affecting the enforcement of creditors' rights generally and by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

(c)  The execution and delivery of this contract will not conflict with any provision of any law or regulation to which Purchaser is subject or any agreement or instrument to which Purchaser is a party or by which it is bound or any order or decree applicable to Purchaser, and will not result in the creation or imposition of any lien on any of Purchaser's assets or property which would materially and adversely affect the ability of Purchaser to carry out the terms of this contract.  Purchaser has obtained any consent,

approval, authorization or order of any court or governmental agency or body required for the execution, delivery or performance by Purchaser of this contract.

(d)    To Purchaser's knowledge, there is no action, suit, arbitration, unsatisfied order or judgment, government investigation or proceeding pending against Purchaser which, if adversely determined, could individually or in the aggregate materially interfere with the consummation of the transaction contemplated by this contract.

(e)  Purchaser is not a, and is not acting directly or indirectly for or on behalf of any, person, group, entity or nation named by Executive Order of the United States Treasury Department as a terrorist, "Specifically Designated National and Blocked Person," or other banned or blocked person, entity, nation or transaction pursuant to any law, order, rule or regulation that is enforced or administered by the Office of Foreign Assets Control and Purchaser is not engaged in this transaction, directly or indirectly, on behalf of, or instigating or facilitating this transaction, directly or indirectly, on behalf of any such person, group, entity or nation.

(f)  The representations and warranties of Purchaser set forth in this Section 5 are made as of the date of this contract and are restated as of the Closing.

For purposes of this §5.02, the phrase "to Purchaser's knowledge" shall mean the actual knowledge of Lorenzo Deluca without any special investigation.

**Section 5.        Covenants of Seller**

Seller covenants that between the date of this contract and the Closing:

Section 5.1.  Intentionally omitted.

Section 5.2.  Intentionally omitted.

Section 5.3.   Seller shall maintain in full force and effect until the Closing the insurance policies described in Schedule G attached hereto.

Section 5.4. Seller shall not withdraw, settle or otherwise compromise any protest or reduction proceeding affecting real estate taxes assessed against the Premises for any fiscal period in which the Closing is to occur or any subsequent fiscal period without the prior written consent of Purchaser, which consent shall not be unreasonably withheld or delayed.

Section 5.5. Seller shall allow Purchaser or Purchaser's representatives access to the Premises upon reasonable prior notice at reasonable times.

Section 5.6. Seller shall operate the Premises in substantially the same manner as the Premises are being operated on the date of this contract.

**Section 6.**        **Seller's Closing Obligations**

**Section 6.1.**    Provided that Purchaser has fulfilled all of its obligations under this Contract, including paying the balance of the purchase price at Closing, then at the Closing, Seller shall deliver the following to Purchaser:

(a)  A Deed selling the Premises free and clear of all liens encumbrances and claims , in form acceptable to the title company and properly executed in proper form for recording so as to convey the title required by this contract.

(b)  To the extent they are then in Seller's possession and not posted at the Premises, certificates, licenses, permits, authorizations and approvals issued for or with respect to the Premises by governmental and quasi-governmental authorities having jurisdiction.

(c)  Such affidavits as Purchaser's title company shall reasonably require in order to omit from its title insurance policy all exceptions for returns against persons or entities whose names are the same as or similar to Seller's name, to omit the rights of parties who are no longer in possession and to limit the exception for tenants and occupants to those having "rights as tenants only".

(d)  (i) Checks to the order of the appropriate officers or the Title Company in payment of all applicable real property transfer taxes and copies of any required tax returns therefor executed by Seller, which checks shall be certified or official bank checks if required by the taxing authority or the Title Company unless Seller elects to have Purchaser pay any of such taxes and credit Purchaser with the amount thereof, and (ii) a certification of non-foreign status, in form required by the Code Withholding Section, signed under penalty of perjury, and (iii) Form RP-5217 (or, in New York City, Form RP-5217NYC).  Seller understands that such certification will be retained by Purchaser and will be made available to the Internal Revenue Service on request.

(e)  If Seller is a corporation and if required by Section 909 of the Business Corporation Law, a resolution of Seller's board of directors authorizing the sale and delivery of the deed and a certificate executed by the secretary or assistant secretary of Seller certifying as to the adoption of such resolution and setting forth facts showing that the transfer complies with the requirements of such law and the deed referred to in §10.1(a) shall also contain a recital sufficient to establish compliance with such law.  If Seller is a partnership or limited liability company, the written consent of the partners or members to the extent required by the partnership agreement or operating agreement and delivery of a certificate executed by the general partner of any partnership or by the manager (if any) or a member of a limited liability company, attaching true and complete copies of the organizational documents of Seller and affirming that the sale and conveyance of title comply with the requirements of such organizational documents (or of the applicable statute, if any).

(f)  A certificate of Seller confirming that the warranties and representations of Seller set forth in this contract are true and complete on and as of the Closing Date (the statements made in such certificate shall be subject to the same limitations on survival as are

applicable to Seller's representations and warranties under §4).

### Section 7.    Purchaser's Closing Obligations

At the Closing, Purchaser shall:

Section 7.1.    Pay to Seller by check, or wire transfer immediately available federal funds, the portion of the Purchase Price payable at the Closing, as adjusted for apportionments under §12 and any other credits or adjustments provided in this contract.

Section 7.2.    Duly complete and sign all required real property transfer tax returns and all tax reports (such as RP-5217), and cause all such returns, reports and checks in payment of such taxes to be delivered to the appropriate officers promptly after the Closing.

Section 7.3.    Deliver to Seller an agreement assuming all of landlord's obligations under the Leases and any subordination, nondisturbance and attornment agreement given by Seller to a subtenant from and after the Closing Date and indemnifying and agreeing to defend Seller against any claims made by tenants, subtenants, licensees or occupants with respect to any failure to perform such obligations.

Section 7.4.    Deliver to Seller a certificate confirming that the warranties and representations of Purchaser set forth in this contract are true and complete as of the Closing Date (the statements made in such certificate shall be subject to the same limitations on survival as are applicable to Purchaser's representations and warranties under §5).

Section 7.5.    Deliver to Seller an agreement assuming all Sellers' obligations under the Union Contracts, if any, affecting the Premises from and after the Closing Date and indemnifying and agreeing to defend Mortgagee and Seller against any claims made by the union(s) with respect to such obligations.

Section 7.6.    Deliver to Seller an agreement assuming all Seller's obligations for brokerage commissions, if any, payable after the Closing with respect to leases entered into by Seller prior to the Closing to the extent such obligations have been disclosed to Purchaser in Schedule E.

Section 7.7.    Deliver any other documents required by this contract to be delivered by Purchaser.

**Section 8.      Apportionments**

**Section 8.1.**   The following apportionments shall be made between the parties at the Closing as of the close of business on the day prior to the Closing Date:

(a)  real estate taxes, water charges and sewer rents, if any, on the basis of the fiscal period for which assessed, except that if there is a water meter on the Premises, apportionment at the Closing shall be based on the last available reading, subject to adjustment after the Closing when the next reading is available;

(b)      If on the Closing Date the Premises shall be affected by an assessment which is or may become payable in annual installments, all installments allocable to the period following the Closing Date shall be Purchaser's responsibility.

If the Closing shall occur before a new tax rate is fixed, the apportionment of taxes at the Closing shall be upon the basis of the old tax rate for the preceding period applied to the latest assessed valuation.  Promptly after the new tax rate is fixed, the apportionment of taxes shall be recomputed.  Any discrepancy resulting from such recomputation shall be promptly corrected, which obligation shall survive the Closing.

Any errors or omissions in computing apportionments at Closing shall be promptly corrected, which obligations shall survive the Closing.

Real estate tax refunds, abatements and credits received after the Closing Date which are attributable to the fiscal tax year during which the Closing Date occurs shall be apportioned between Seller and Purchaser, after deducting the expenses of collection thereof, which obligation shall survive the Closing. Any tax refunds shall be payable to Seller.

Prior to the Closing Date Seller shall use commercially reasonable efforts to obtain from the agency of the City of New York having jurisdiction thereof readings of all water meters at the Premises within the 30-day period preceding the Closing Date.

**Section 9.      Objections to Title, Vendee's Lien, Remedies for Purchaser's Default, Procedure on Termination of Contract by Purchaser**

**Section 9.1.**   Purchaser shall promptly order an examination of title and shall cause a copy of the title report to be forwarded to Seller's attorney upon receipt.

Section 9.2.   If Seller shall be unable to convey title to the Premises at the Closing in accordance with the provisions of this contract, Purchaser, nevertheless, may elect to accept such title as Seller may be able to convey without any credit against the monies payable at the Closing or liability on the part of Seller.  If Purchaser shall not so elect, Purchaser may terminate this contract, which termination shall be subject to the provisions of §13.7.  Seller shall not be required to bring any action or proceeding or to incur any expense in excess of the Maximum Expense specified in <u>Schedule D</u> to cure any title defect or to enable Seller otherwise to comply with the provisions of this contract, but the foregoing shall not permit Seller to refuse to pay off at the Closing, to

-8-

the extent of the monies payable at the Closing, mortgages or other liens on the Premises which can be satisfied or discharged by payment of a sum certain.

Section 9.3.    Any unpaid taxes, assessments, water charges and sewer rents, together with the interest and penalties thereon to a date not less than two days following the Closing Date, and any other liens and encumbrances which Seller is obligated to pay and discharge or which are against corporations, estates or other persons in the chain of title, together with the cost of recording or filing any instruments necessary to discharge such liens and encumbrances of record, may be paid out of the proceeds of the monies payable at the Closing if Seller delivers to Purchaser on the Closing Date official bills for such taxes, assessments, water charges, sewer rents, interest and penalties and instruments in recordable form sufficient to discharge any other liens and encumbrances of record. Upon request made a reasonable time before the Closing, Purchaser shall provide at the Closing separate checks for the foregoing payable to the order of the holder of any such lien, charge or encumbrance and otherwise complying with §2.2. If Purchaser's title insurance company is willing to insure both Purchaser and Purchaser's institutional lender, if any, that such charges, liens and encumbrances will not be collected out of or enforced against the Premises, then, unless Purchaser's institutional lender reasonably refuses to accept such insurance in lieu of actual payment and, discharge, Seller shall have the right, in lieu of payment and discharge, to deposit with the title insurance company such funds or assurances or to pay such special or additional premiums as the title insurance company may require in order to so insure. In such case the charges, liens and encumbrances with respect to which the title insurance company has agreed so to insure shall not be considered objections to title.

Section 9.4.    Notwithstanding anything to the contrary contained herein, if Purchaser shall default in the performance of its obligations under this contract, the sole remedy of Seller shall be to retain the Downpayment as liquidated damages which shall be remitted to the Seller for all loss, damage and expense suffered by Seller, including without limitation the loss of its bargain, subject, however, to Seller's rights under §14 and §17.4.

Section 9.5.    If (a) Purchaser shall have grounds under this contract for refusing to consummate the purchase provided for herein, or (b) Purchaser or Seller terminates this contract pursuant to a provision that refers to this Section, the sole liability of Seller shall be to refund the Downpayment to Purchaser. Upon the giving of the termination notice and Seller's refund of the Downpayment, this contract shall be null and void and the parties hereto shall be relieved of all further obligations and liability other than any arising under §14 and §17.4. Notwithstanding anything to the contrary, Purchaser reserves all of its rights in law and equity, including the right to specific performance.

**Section 10.    Notices**

**Section 10.1.**        All notices under this contract shall be in writing and shall be delivered personally with receipt acknowledged or shall be sent by (i) prepaid certified mail, or (ii) prepaid nationally recognized overnight courier for next business day delivery with receipt acknowledged, in each case addressed as set forth in Schedule D or as Seller or Purchaser shall otherwise have given notice as herein provided.  Notice sent by certified mail shall be deemed received on the third business day following mailing.  Notice sent by overnight courier shall be deemed received on the first business day following delivery to the overnight courier.  Notices under this contract may not be given by e-mail or other electronic system.  Any notice under this contract may be given by the attorneys of the respective parties who are hereby authorized to do so on their behalf.

**Section 11.    Limitations on Survival of Representations, Warranties, Covenants and other Obligations**

**Section 11.1.**        Except as otherwise provided in this contract, no representations, warranties, covenants or other obligations of Seller set forth in this contract shall survive the Closing, and no action based thereon shall be commenced after the Closing.

Section 11.2.        The delivery of the deed by Seller, and the acceptance thereof by Purchaser, shall be deemed the full performance and discharge of every obligation on the part of Seller to be performed hereunder, except those obligations of Seller which are expressly stated in this contract to survive the Closing.

**Section 12.  Miscellaneous Provisions**

**Section 12.1.**  Purchaser may assign this contract or its rights hereunder without the prior written consent of Seller.  No assignment of Purchaser's rights under this contract shall be effective unless and until an executed counterpart of the instrument of assignment shall have been delivered to Seller and Seller shall have been furnished with the name and address of the assignee.  The term "Purchaser" shall be deemed to include the assignee under any such effective assignment

(a) If Seller or Purchaser is or may in the future be under contract with a qualified intermediary for the purpose of effecting a tax-deferred exchange in accordance with Section 1031 of the Internal Revenue Code of 1986, as amended, each party consents to the assignment of this contract to such intermediary.  Each party shall cooperate with the other and with the qualified intermediary to accomplish such exchange and shall perform any acts and execute any and all documents reasonably necessary to assist in such exchange, provided that neither party shall be required to accept title to any property other than the Premises, expend any additional amounts of money above those amounts for which it is obligated under this contact or extend the Closing Date, and Seller's time to close under this contract shall not be reduced.  Seller and Purchaser shall each defend, indemnify and hold the other harmless from and against expenses, costs and damages of any kind (including reasonable attorneys' fees) suffered by either resulting from the performance of, or failure to perform, any acts of cooperation necessitated by this Section

Section 12.2.    This contract embodies and constitutes the entire understanding between the parties with respect to the transaction contemplated herein, and all prior agreements, understandings, representations and statements, oral or written, are merged into this contract.    Neither this contract nor any provision hereof may be waived, modified, amended, discharged or terminated except by an instrument signed by the party against whom the enforcement of such waiver, modification, amendment, discharge or termination is sought, and then only to the extent set forth in such instrument.

Section 12.3.    This contract shall be governed by, and construed in accordance with, the law of the State of New York.

Section 12.4.    The captions in this contract are inserted for convenience of reference only and in no way define, describe or limit the scope or intent of this contract or any of the provisions hereof.

Section 12.5.    This contract shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs or permitted successors and permitted assigns.

Section 12.6.    This contract shall not be binding or effective until properly executed and delivered by Seller and Purchaser.

Section 12.7.    As used in this contract, the masculine shall include the feminine and neuter, the singular shall include the plural and the plural shall include the singular, as the context may require.

Section 12.8.    If the provisions of any schedule or rider to this contract are inconsistent with the provisions of this contract, the provisions of such schedule or rider shall prevail.  Set forth in Schedule D is a list of any and all schedules and riders which are attached hereto but which are not listed in the Table of Contents.

Section 12.9.    This contract may be executed in two or more counterparts, each of which shall be deemed an original but all of which together shall be one instrument.

Section 13.10  The Premises, after the date hereof, will not be encumbered nor will Seller convey, pledge, hypothecate, assign, sell, dispose of or transfer any interest in the Premises, unless and until this contract is canceled for any reason. All of the air rights and excess FAR and development rights for the Premises to the maximum permitted by law are intact and have not nor will they be sold, transferred, assigned, sold, hypothecated, pledged or conveyed or disposed of (collectively, the "Development Rights"). There are no outstanding agreements nor will there be at Closing any agreements relating to the Development Rights. To Seller's knowledge, the Premises are not landmarked nor the subject of potential landmarking.

Section 13.11  There are no actions, suits, notices, claims or proceedings or conditions (or potential actions, suits, notices, claims or conditions) relating to a violation or non-compliance (or potential or threatened violation or potential or threatened non-compliance) with any laws or with respect to the disposal, storage, discharge or release of

hazardous materials to, at or from the Premises, including, without limitation, any of such relating to lead paint and/or asbestos. To Seller's knowledge, there are no hazardous materials at, upon or under the Premises or any portion thereof. Seller has no reason to believe that there exists on property adjacent to the Premises any soil, air, surface water or groundwater contamination that threatens the Premises. If and to the extent that any oil tank is no longer in use or has been removed, such has been, fully in compliance with applicable law, decommissioned and/or removed and all final signs-offs have been obtained, copies of which shall be delivered to Purchaser within five (5) business days from the date hereof. The cost associated with any environmental clean-up, remediation or compliance shall be at the sole cost and expense of the Seller and shall be effectuated prior to Closing.

Section 13.12    Seller shall: (i) comply with all laws and/or governmental rules, regulations, codes and statutes relating to the Premises and deliver the Premises free and clear of all monetary obligations violations whether of record or otherwise (collectively, "Applicable Laws"); (ii) comply with all insurance requirements; (iii) obtain and maintain in full force and effect all insurance coverages affecting the Premises so as not to be deemed a co-insurer; (iv) maintain in full force and effect all mortgages affecting the Premises and (v) cure and cause to be dismissed of record all violations and/or conditions which could be a violation under Applicable Laws. Documentary evidence of the foregoing from the pertinent governmental or quasi-governmental agency shall be delivered to the Purchaser at Closing.

Section 13.13    If, prior to the Closing, there shall occur (i) damage to the Premises caused by fire or other casualty which would cost an amount exceeding ten (10%) percent of the Purchase Price to repair (or ten (10%) of any one building comprising the Premises), as reasonably determined by an engineer selected by Purchaser, or (ii) a taking by condemnation of any portion of the Property, then, and in either such event, Purchaser may elect to terminate this Contract by written notice given to the Seller within thirty (30) days after Seller's notice to Purchaser of casualty or condemnation, as the case may be, or at the Closing, whichever is earlier, in which event Seller shall promptly instruct Escrow Agent to release and pay over the Down Payment to Purchaser together with all accrued interest thereon, if any, whereupon this Contract shall be null and void and neither party hereto shall thereupon have any further right, duty or obligation hereunder, except as to matters which are expressly stated to survive termination of this Contract. If Purchaser elects not to terminate this Contract, then the Closing shall take place as herein provided, without abatement of the Purchase Price, and Seller shall assign to Purchaser at the Closing, by written instrument in form reasonably satisfactory to Purchaser, all of Seller's interest in and to any insurance proceeds or condemnation awards which may be payable to Seller on account of any such fire, casualty or condemnation, shall deliver to Purchaser any such proceeds or awards actually theretofore paid, less any amounts (the "Reimbursable Amounts") (A) actually expended or incurred by Seller in adjusting any insurance claim or negotiating and/or obtaining any condemnation award (including, without limitation, reasonable attorneys' fees and expenses), and/or (B) theretofore actually incurred or expended by or for the account of Seller for the cost of any compliance with laws or the Leases, protective restoration, or emergency repairs made by

or on behalf of Seller (to the extent Seller has not theretofore been reimbursed by its insurance carriers for such expenditures). The proceeds of rent interruption insurance, if any, shall on the Closing Date be appropriately apportioned between Purchaser and Seller. No settlement shall be made with respect to such casualty or condemnation without the prior written consent of the Purchaser. Purchaser shall have the exclusive right to, among other things, negotiate, settle and allocate the proceeds of such insurance and condemnation. Purchaser will not be obligated to close title until such time as the proceeds shall have been determined in an amount necessary to fully restore the Premises and the Seller's insurer has agreed in writing to pay such proceeds or in the case of a condemnation that the governmental agency has agreed to pay such proceeds in accordance with statute.

If, prior to the Closing, there shall occur (i) damage to the Premises caused by fire or other casualty which would cost less than ten (10%) percent of the Purchase Price (or less than ten 10%) percent of one building which comprises Premises) the to repair, as reasonably determined by an engineer selected by Purchaser, then, neither party shall have the right to terminate its obligations under this Contract by reason thereof, but Seller shall assign to Purchaser at the Closing, by written instrument in form and substance reasonably satisfactory to Purchaser, all of Seller's interest in any insurance proceeds which may be payable to Seller on account of any such fire or casualty, as the case may be, or shall deliver to Purchaser any such proceeds or awards actually theretofore paid, in each case less any Reimbursable Amounts. The proceeds of rent interruption insurance, if any, shall on the Closing Date be appropriately apportioned between Purchaser and Seller. No settlement shall be made with respect to such casualty without the prior written consent of the Purchaser. Purchaser shall have the exclusive right to, among other things, negotiate, settle and allocate the proceeds of such insurance. Purchaser will not be obligated to close title until such time as the proceeds shall have been determined and the Seller's insurer has unconditionally agreed in writing to pay such proceeds to the Purchaser and such proceeds are sufficient to fully restore the casualty. Seller shall fully cooperate pre and post Closing to assist the Purchaser in collecting the full insurance proceeds. In the event that the Purchaser elects to close under this Contract then the Purchaser shall also receive a credit for any deductible
under any and all insurance policies.

Section 13.14  Seller shall cooperate with Purchaser in facilitating an assignment and/or assumption of any outstanding Mortgage to Purchaser's Lender or to Purchaser, provided that said cooperation does not create any additional expense to Seller nor delay the Closing.

Section 13.15  Each party (herein, the "Exchanging Party") may consummate the sale or purchase, as the case may be, of the Premises as part of a socalled like-kind exchange (the "Exchange") pursuant to §1031 of the Internal Revenue Code of 1986, as amended, provided that: (i) the Exchanging Party shall effect the Exchange through an assignment of this Contract, or its rights under this Contract, to a qualified intermediary and the other party to this Contract shall not be required to acquire or hold title to any real property or sell the Premises to any other third party, as the case may be, for purposes of

consummating the Exchange; (ii) the Exchanging Party shall pay any additional costs that would not otherwise have been incurred by either party had the Exchanging Party not consummated the sale or purchase, as the case may be, through the Exchange and (iii) the Exchanging Party shall, and hereby does, indemnify, and hold the other party harmless from, any loss, cost, damages, liability or expense which may arise or which the other party may suffer in connection with, an Exchange. The other party shall not by this Contract or acquiescence to the Exchange (1) have its rights under this Contract affected or diminished in any manner or (2) be responsible for compliance with or be deemed to have warranted to the Exchanging Party that the Exchange in fact complies with §1031 of the Code; nor shall the terms or provisions of this Contract be modified, amended or extended thereby.

**IN WITNESS WHEREOF**, the parties hereto have executed this contract as of the date first above written.

Seller:
LIBERTY TOWERS REALTY I LLC
LIBERTY TOWERS REALTY LLC

by:     Toby Luria, Managing Member

Purchaser:
**Delshah Ventures LLC (or its assignee )**

by:     Lorenzo Deluca, Member

Receipt by Escrowee The undersigned Escrowee hereby acknowledges receipt of $450,000.00, by Bank check or wire Transfer subject to collection, to be held in escrow pursuant to §2.02.

**Escrowee:**
**LAW OFFICES OF DAVID CARLEBACH, ESQ.**

by:     David Carlebach, Principal

**Schedule A**

**DESCRIPTION OF PREMISES**

(to be attached separately and to include tax map designation)

## Schedule B

## PERMITTED EXCEPTIONS

1.            Zoning and subdivision laws, regulations and ordinances and landmark, historic or wetlands designations, which are not violated by the existing structures or present use thereof.

2.            Consents by the Seller or any former owner of the Premises for the erection of any structure or structures on, under or above any street or streets on which the Premises may abut provided same do not render title unmarketable.

3.            If Schedule C provides for the acceptance of title by Purchaser subject to one or more Existing Mortgage(s), the Existing Mortgage(s) and financing statements, assignments of leases and other agreements ancillary thereto.

4.            ~~Leases and Tenancies specified in the Rent Schedule and any new leases, tenancies, occupancy agreements and licenses not prohibited by this contract and of which Purchaser has been apprised of.~~

5.            Unpaid installments of assessments not due and payable on or before the Closing Date; and real estate taxes that are a lien but are not yet due and payable.

6.            Financing statements, chattel mortgages and liens on personalty filed more than 5 years prior to the Closing Date and not renewed, or filed against property or equipment no longer located on the Premises or owned by Tenants-provided Purchaser's title company can insure same.

7.     Rights of easements of utility companies provided that none of such rights imposes any monetary obligation on the owner of the Premises or interferes with the existing or proposed use of the Premises.

8.            De minimis encroachments of stoops, areas, cellar steps, trim cornices, lintels, window sills, awnings, canopies, ledges, fences, hedges, coping and retaining walls projecting from the Premises over any street or highway or over any adjoining property and encroachments of similar elements projecting from adjoining property over the Premises.

9.            Revocability or lack of right to maintain vaults, coal chutes, excavations or sub-surface equipment beyond the line of the Premises.

10.            Any state of facts that an accurate survey would disclose, provided that such facts do not render title uninsurable or unmarketable without additional premium or charge or is a Permitted Exception.

**Schedule C**

**PURCHASE PRICE**

The Purchase Price shall be paid as follows:

| | | |
|---|---|---|
| (a) | Downpayment $450,000.00 by bank, wire or certified funds payable at the contract signing. | $450,000.00 |
| (b) | By check or checks delivered or wire transfers of federal funds to Seller at the Closing in accordance with the provisions of §2.2: | $8,550,000.00 |
| (c) | Total Purchase Price: | $9,000,000.00 |

## Schedule D

## MISCELLANEOUS

Address of Premises:  The entire land at 180 Richmond Terrace, Staten Island, New York 10301, 184 Richmond Terrace, Staten Island, New York 10301, 186 Richmond Terrace, Staten Island, New York 10301, 188 Richmond Terrace, Staten Island, New York 10301, 190 Richmond Terrace, Staten Island, New York 10301, 192 Richmond Terrace, Staten Island, New York 10301, 194 Richmond Terrace, Staten Island, New York 10301(Blocks 13, Lots 75, 78, 79, 80, and 81) and 170 Richmond Terrace, Staten Island, New York 10301, 178 Richmond Terrace, Staten Island, New York 10301, 20-24 Stuyvesant Place (a/k/a 27-33 Hamilton Avenue), Staten Island, New York 10301, 18 Stuyvesant Place, Staten Island, New York 10301, 8 Stuyvesant Place, Staten Island,  New York 10301 (Blocks 13, Lots 100, 103, 104, 82, and 92).

1. **Title insurer designated by Purchaser (§1.02): Millennium Abstract Corp.**

2. **Intentionally omitted.**

3. **Intentionally omitted.**

4. **Intentionally omitted.**

5. **Seller's tax identification number:Liberty Towers Realty I, LLC: 80-0172803 and; Liberty Towers Realty, LLC: 11-2986977.**

6. **Purchaser's tax identification number:_____**

7. **Scheduled time and date of Closing (§3.01): _____ , 30 days after the entry of an Order by the Bankruptcy Court approving a plan of reorganization approving the terms of this contract of sale free and clear of all liens encumbrances and claims to Purchaser.**

8. **Place of Closing (§3.01): The Law Offices of David Carlebach, Esq., One Exchange Plaza, Suite 1902, New York, New York 1006**

9. **Intentionally omitted.**

10. **Intentionally omitted.**

11. **Intentionally omitted.**

12. **Intentionally omitted.**

13.      Intentionally omitted.
14.      Intentionally omitted.
15.      Intentionally omitted.
16.      Intentionally omitted.
17.      Address for notices (§15.01):

18.      If to Seller:

19.      The Law Offices of David Carlebach, Esq.
20.      One Exchange Plaza- Suite 1902
21.      New York, NY 10006

22.      If to Purchaser:

23.      Mark Frankel, Esq.
Backenroth Frankel & Krinsky
489 5th Ave #28,
New York, NY 10017

**Schedule E**

**RENT SCHEDULE**

**(Intentionally Omitted)**

**Schedule F**

**FORM OF ESTOPPEL LETTER**

**(Intentionally omitted)**

**Schedule G**

**INSURANCE POLICIES**

## Schedule H

## EMPLOYEES

**None**

**Schedule I**

**SERVICE CONTRACTS**

**None**

**Schedule J**

**CERTIFICATE OF OCCUPANCY**

**Intentionally omitted**

**Schedule K**

**PURCHASE MONEY NOTE AND MORTGAGE**

**Intentionally omitted**